UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| KNOWLEDGEAZ, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-1019- RLY-JMS |
| | ) | |
| JIM WALTERS RESOURCES, INC., GUY | ) | |
| HENSLEY, JAMES BEASLEY, DENNIS | ) | |
| SEIPEL, DANIEL MADDOX, | ) | |
| NICKELLIE, LLC and ACTION | ) | |
| AUTHORITY, LLC, | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANT HENSLEY'S MOTION TO DISMISS,
DEFENDANTS SEIPEL'S AND ACTION AUTHORITY'S MOTION FOR
SUMMARY JUDGMENT, DEFENDANTS HENSLEY'S AND JIM WALTERS
RESOURCES' MOTION FOR SUMMARY JUDGMENT AND
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, KnowledgeAZ, Inc. ("KAZ"), is a software company.  It has brought this

lawsuit against two of its former employees, their new businesses, a former customer and

two of its employees.  The suit alleges a variety of claims, including copyright

infringement and inducement to infringe, breach of contract, breach of fiduciary duty,

tortious interference with contract relationships, conversion, civil conspiracy, and fraud.

KAZ is an Indiana corporation and the successor to Action Systems Associates,

Inc. ("ASA").  Nigam Arora is the president, sole officer and sole shareholder of KAZ.

Nigam Arora is an entrepreneur who claims to have started over fifty businesses.  His

1

wife, Lovi Arora is the former CFO of KAZ.  Dennis Seipel and Daniel Maddox are former employees of KAZ.  Nickellie, LLC ("Nickellie") is an Indiana business started by Maddox, and Action Authority, LLC ("Action Authority") is an Indiana business with which Seipel is now involved.  Jim Walters Resources, Inc. ("JWR") is a business based and incorporated in Alabama, and a former customer of KAZ.  James Beasley worked for JWR until his death shortly after this suit was filed.  Guy Hensley is the general counsel for JWR and a resident of Alabama.  Maddox, Nickellie, Seipel, Action Authority,  JWR, Beasley and Hensley, have all been named by KAZ as Defendants in this lawsuit.

To date, the court has entered judgment in favor of Defendant, James Beasley, because following Beasley's death KAZ made no effort to substitute his estate as the appropriate party.  The clerk has entered a default against Nickellie, for its failure to respond.  No judgment for damages has been entered against Nickellie because the calculation of damages, if any, is premature until such time as the liability, if any, of the other Defendants has been determined.  This entry addresses the renewed motion to dismiss for lack of personal jurisdiction filed by Defendant Hensley, the pending summary judgment motions filed by Defendants JWR, Hensley, Action Authority and Seipel and also the partial summary judgment motion filed by KAZ.

## FACTUAL BACKGROUND

In April of 1992, ASA registered a copyright in a computer program known as Action Material Manager Plus ("AMMP").  ASA was acquired by an Arora owned entity, which was then merged into KAZ in June of 2000.  On January 10, 2001, KAZ and JWR entered into a System Sales Agreement (" SS Agreement") whereby JWR agreed to purchase, and KAZ agreed to provide, computer software called eWarehouseA-Z along with  hardware and support services.  The SS Agreement utilized by KAZ has a set of general terms and conditions, but begins with two pages of descriptions and three pages of exhibits which are specific to the agreement with JWR.  Paragraphs four and six on the first page of the SS Agreement contain most of the specific substantive provisions at issue in this dispute and in pertinent part read as follows:

> **4.**  KnowledgeAZ [KAZ] grants Client [JWR] a perpetual, non-exclusive and non-transferrable license to the software in the system.  The software in the system is the property of KnowledgeAZ and is licensed to Client for use in one system and with only the number of terminals authorized by KnowledgeAZ.  Client shall not copy, rent, distribute, sell, lease, sublicense, alter, modify, translate, decompile, disassemble or shall also not disclose, display or otherwise make available the licensed software to any person or persons not authorized by KnowledgeAZ.  If Client violates this Agreement in any manner, the license granted to Client will be immediately terminated.  If at any time KnowledgeAZ should become insolvent KnowledgeAZ shall provide the current eWarehouseA-Z source code to Jim Walter Resources.

> **6.**  Licensee understands that certain hardware is an integral part of the eWarehouseA-Z systems and for eWarehouseA-Z to function properly, such hardware must be properly integrated with eWarehouseA-Z.  Client agrees to purchase all such hardware and services related to eWarehouseA-Z from KnowledgeAZ, under the condition that KnowledgeAZ shall

provide the products to Client at prices equal to or less than Client can purchase the same products from the manufacturer or authorized distributor/reseller, and so long as KnowledgeAZ agrees that they will provide the products to Client in a timely manner.  If KnowledgeAZ does not meet both of the previous conditions, Client may purchase the products from the manufacturer or authorized distributor/reseller and KnowledgeAZ will provide the required changes to the hardware at a minimal cost to Client.   Should KnowledgeAZ cease to provide the services required to make the hand-helds and RF hardware units function with the eWarehouseA-Z Software, KnowledgeAZ shall provide to Client the right, instructions and access to the process that will permit Client to make those changes.  Such hardware does not include client PC's non-RFnetworks, laser printers and dot matrix printers.

KAZ and JWR entered into a System Support Upgrade Agreement (the "Upgrade Agreement") on August 16, 2002, which extended, through August 4, 2003, KAZ's maintenance and support of the eWarehouse system.  JWR paid $23,217 for the extension of those services.  Finally, because KAZ has initiated the lawsuit, both agreements provide for the application of Indiana law in interpreting their terms.

Dennis Seipel was a programmer for KAZ and its predecessors, who graduated into project management.  Seipel signed the SS Agreement on behalf of KAZ and played a role in the management of that project during its first few months.  Seipel left the employ of KAZ at the end of July 2001.  KAZ contends that Seipel failed to return tapes containing the source code for eWarehouseA-Z when it fired him.  It also contends that when confronted about his possession of the eWarehouseA-Z source code on several occasions by Nigam Arora, he gave inconsistent responses with regard to whether he had the source code or intended to use it. KAZ alleges that Seipel was conspiring with

4

Maddox and Hensley to provide the source code to JWR.

Daniel Maddox was a programmer for KAZ who also participated in the management of KAZ and handled the JWR project.  He left KAZ's employment in December 2002.  He claims he left because KAZ was unable to make payroll and owed him considerable salary.   It does not appear from the record that KAZ has ever specifically denied its failure to make payroll during late 2002, but it does claim that the same day that Maddox left, its server and backup tapes were stolen.  The backup tapes contained the source code for eWarehouseA-Z, and KAZ believes Maddox stole the server and backup tapes in order to obtain the source code.  In fact, Nigam Arora testified in deposition that he spoke with Maddox after he left and was told by Maddox that he had the missing server and source code and had reached an agreement with JWR to provide it with support.  A program's source code is its programming instructions in original readable form.  After written, source code goes through a translation process where it is transferred into a code or language understood by the computer, so that the program can be executed.  With a program's source code, a person can modify the program or alter the way the program is executed.  The code also allows one to troubleshoot problems with the program.  JWR says that it had no deal with Maddox or his company to provide support for its system until well after KAZ had given up any effort to provide program maintenance.

On January 2, 2003, legal counsel for KAZ sent a letter to JWR, which stated:

We are attorneys representing Knowledge A-Z, Inc. (The "Company").  Due to the unexpected departure of its employees, the Company has suspended operations at this time and, unfortunately, can no longer offer you support.

In addition, the Company no longer has control over its intellectual property, including passwords used to log on to your systems.  You are advised to take whatever security measures you deem appropriate.

At the present time, the Company is exploring the possibility of finding a buyer capable of supporting you.

You will be given additional information as it becomes available to us.

After unsuccessfully attempting to reach Nigam Arora directly, JWR drafted a written response, dated January 6, 2003, and sent it directly to Nigam Arora at KAZ, advising KAZ that it was in breach of the SS Agreement and had been for almost a month, the period of time which JWR had been attempting to procure service assistance without response from KAZ.  The letter asked that KAZ either satisfy its contractual obligations immediately or return a portion of the payment JWR made to procure the extended service and maintenance.  If KAZ was insolvent, JWR asked that it be provided with the source code for eWarehouse-AZ.

Nigam Arora, claims to have written and sent a letter to JWR on behalf of KAZ on the same date that JWR's letter to KAZ was sent, January 6, 2003.  Mr. Arora's letter accuses JWR of "colluding" with Daniel Maddox and being in violation of the terms of the SS Agreement.  It states that KAZ was aware that Maddox had stolen KAZ's "software," and that KAZ was revoking JWR's license to use eWarehouseA-Z as a result

of its contractual breach, but goes on to state that if the revocation is in error, JWR should contact Mr. Arora. The letter does not provide any detail as to how JWR was in breach or what JWR and Maddox were colluding to do. JWR claims that it never received the letter and questions whether it was ever sent or even created prior to the litigation.

On January 20, 2003, Maddox, on behalf of Nickelli, sent a written proposal to JWR to assume the service and maintenance responsibilities for JWR's "account." JWR accepted the proposal and also claims to have relied on Nickellie to help develop custom software solutions to work around the problems it incurred because KAZ would not supply it with the source code for eWarehouseA-Z. Nigam Arora's wife, Lovi Arora, filed a police report on March 28, 2003, claiming that a server and various pieces of software, including the eWarehouseA-Z software, had been stolen on December 10, 2002.

JWR filed suit against KAZ in state court in Alabama on December 8, 2004, claiming that KAZ had failed to live up to its obligations under the SS Agreement and Upgrade Agreement to provide service or provide the source code so that continuing service and maintenance could be accomplished by JWR. KAZ filed its lawsuit in July 2005. KAZ seeks to prevail in nine counts: (1) copyright infringement, (2) inducement to infringe a copyright, (3) breach of contract, (4) breach of fiduciary duty, (5) tortious interference, (6) conversion, (7) civil conspiracy, (8) treble damages as a statutory crime victim, and (9) fraud.

During the course of this lawsuit, in April 2006, Maddox filed a petition for Chapter 13 bankruptcy protection in the bankruptcy court for this district.  KAZ filed an adversary proceeding objecting to any discharge in bankruptcy on the basis that Maddox had stolen from it certain hardware and software, causing millions of dollars of damage to KAZ, and had breached fiduciary duties he owed KAZ.  The bankruptcy court held a two day trial on the adversary complaint and on December 28, 2007, rendered a judgment in favor of Maddox, which in relevant parts found as follows:

- Maddox was employed under a written agreement which he entered into with KAZ's predecessor, ASA.  It had a noncompete clause.

- KAZ employed as many as 16 employees at one time, but by December 10, 2002, it employed only Maddox, Chris Hemminger (another programmer) and a receptionist.

- On December 10, 2002, Maddox and Hemminger met with Nigam and Lovi Arora and were advised that KAZ was being forced to move out of its offices because it was 6 months in arrears in rent and that KAZ could no longer pay their salaries.

- KAZ had only 5 customers as of December of 2002.

- KAZ posted considerable losses on its income taxes for 2001 and 2002.

- Aware of the financial difficulties KAZ was suffering, Maddox had created Nickellie in July 2002, for the purpose of selling Pocket PC software direct to consumers over the internet; however, Nickellie had not commenced its business prior to Maddox leaving KAZ and the creation of the company did not violate Maddox's employment agreement.

- KAZ ceased operations on December 11, 2002, after Maddox and Hemminger resigned, leaving KAZ with no programmers and no operations going forward.

- "Because KAZ effectively ceased doing business in December, 2002, JWR and NalPac continued to look to Maddox for assistance in customizing and streamlining its computer software.  The various

communications introduced into evidence corroborate Maddox's allegations that he did not have access to the particular source codes which supported the KAZ software."

- "Because KAZ was no longer an operating entity, it had no business interest to protect at the time that Maddox began operating as Nickellie, LLC. Because there was no business to compete with, it would be unreasonable to enforce the noncompete clause."

- Maddox breached his employment agreement by not giving proper notice of his departure, but KAZ's failure to pay him was a prior breach and a justified cause for Maddox's departure.

- KAZ failed to prove that Maddox engaged in any fraud, embezzlement, theft or racketeering.

- Aside from self-serving testimony, KAZ has not presented any evidence of damages as a result of Maddox's actions.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether a genuine issue of material fact exists, the court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *See id.* at 255.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of

9

[the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A party moving for summary judgment on a claim on which the nonmovant party bears the burden of proof at trial may discharge its burden by showing, "that is, pointing out," an absence of evidence to support the nonmovant's case. *Id*. at 325.

## ANALYSIS

The court has organized its analysis by way of Defendants. Each section of the analysis discusses the arguments raised by the particular Defendants noted in that section's subtitle. Needless to say, the issues relevant to the motions of each of the Defendants are relevant to Plaintiff's motion as well and the result of the court's analysis of Defendants' motions essentially dictates the result with respect to Plaintiff's Motion for Partial Summary Judgment. Said another way, the denial of Plaintiff's motion amounts to the corollary of the court's decision with respect to the Defendants' motions.

### Defendants Seipel & Action Authority

Defendants Seipel and Action Authority argue that they are entitled to summary judgment for a number of reasons, the cardinal reason being the running of all applicable statutes of limitations. The statute of limitations for bringing an action based on copyright infringement is three years from accrual. 17 U.S.C. § 507(b). The state law tort claims brought against Seipel and Action Authority (breach of fiduciary duty,

conversion, civil conspiracy and treble damages for criminal violations) all have a two year limitations period.

The evidence which KAZ relies on in support of its copyright infringement and inducement claims against these two defendants comes entirely from the affidavits and deposition testimony of Nigam Arora.  Much of that testimony is inadmissible hearsay, such as the paragraphs of Arora's affidavits which are based on what he heard from (1) "my counsels" [sic], (2) "a warehouse employee," (3) "a former employee," (4) Irv Huffman, (5) Ralph Caplan, and (6) Bill White.  KAZ has had an opportunity to turn such hearsay into admissible direct testimony through the discovery process, but has failed to do so.  The only admissible evidence in support of KAZ's claims against Seipel and Action Authority submitted of record by KAZ are the statements against interest or admissions which Nigam Arora claims were made to him directly by Seipel.

The speculation provided by Nigam Arora in his deposition testimony and self-serving affidavits is also inadmissible and often irrelevant to the claims KAZ is pursuing in this lawsuit.  Arora's allegations in his deposition testimony to the effect that, while with KAZ, (1) Seipel billed clients for work without recording it on KAZ's books, (2) purposefully made entries to KAZ's books to make them unintelligible, (3) kept or cashed the client's checks,  and (4) destroyed many important documents, are all inadmissible and irrelevant to KAZ's claims as set forth in its Amended Complaint.  KAZ's claims of copyright infringement, conversion and breach of fiduciary duty are all made with respect

to the software, its source code and related items, not with respect to some other allegedly inappropriate employee behavior.

KAZ claims that at the time it fired Seipel in July 2001, he had backup tapes for eWarehouseA-Z at his home.  It claims the tapes contained the software's source code and that Seipel refused to return them because he said he was owed money by KAZ. Nigam Arora is the source of this testimony and it is admissible because, as an officer of the company, he would have knowledge of what resources a key employee of the company  would have and of any refusal by that employee to return KAZ property in his possession.  However, if KAZ is pursuing Seipel for infringement in connection with his keeping the eWarehouseA-Z software backup tapes, the three year statute of limitations had long past at the time it filed its complaint in July of 2005.  KAZ seeks to avoid the running of the limitations period on the basis that Seipel later changed his story, more than once, and also engaged in additional infringement activities.

In one of his many submitted affidavits, Nigam Arora claims that Seipel told him in a 2002 phone conversation that he did not have the backup tapes.  Nigam Arora also claims that Seipel again altered his representations by stating to Arora in the fourth quarter of 2003 that he did have the tapes, but had not used them and had no intention of using them.  Based on these subsequent alleged declarations by Seipel, KAZ argues the limitations period was tolled.  While Seipel has claimed in this lawsuit that he did not keep the backup tapes when he left, his legal argument here is that Nigam Arora cannot

12

claim that he was aware of Seipel's unauthorized retention of the backup tapes in 2001,

assert a counterclaim for conversion of the tapes against Seipel in a 2002 lawsuit Seipel

brought against KAZ, and then fail to bring an action for copyright infringement within

three years of either.

First, the court is not convinced that the mere retention of software backup tapes

by a departing employee, in and of itself, constitutes copyright infringement.  Certainly

use or distribution of those backup tapes, the critical data or the source code contained

therein, as is also alleged by KAZ, would violate copyright laws, but mere continued

possession of the vessel for such copyrighted information, the tapes, may not infringe an

exclusive right held by KAZ.  *See Khandji v. Keystone Resorts Management, Inc.*, 140

F.R.D. 697, 700 (D. Colo. 1992).  However, the court need not delve into that issue too

deeply as it is clear that, to the extent continued possession does constitute infringement,

KAZ has admitted that it was aware of the continued possession more than three years

before this suit was brought and it even raised a related claim to that effect in previous

litigation.  Without question, it cannot now claim that the vacillating responses of the

alleged infringer, with regard to whether he continued to possess the copyrighted

material, tolls its obligation to pursue its claim.  Such a contention is tantamount to an

injured individual claiming that the limitations period for personal injury is tolled when

the person she saw push her down, causing the injury, tells the injured individual that it

really was not him that pushed her.  That is nonsensical.  If you have reliable evidence of

a copyright violation, you have a duty of diligence in pursuing that evidence and any resulting claim.  *See Taylor v. Meirick,* 712 F.2d 1112, 1118 (7th Cir. 1983). Accordingly, any claim by KAZ that Seipel's possession of the software backup tapes contitutes copyright infringement is barred by the statute of limitations.

On the other hand, to the extent that KAZ claims that Seipel infringed its copyright by utilizing the source code or other copyrighted material contained on the tapes in connection with specific infringing activities which KAZ first became aware of within three years of filing suit, those claims would not be barred by the fact that KAZ was aware of mere possession of the tapes in 2001.  Nor would such claims be barred because KAZ asserted a claim against Seipel in 2002 based on the alleged unauthorized possession.  Thus, the question at this point is what admissible evidence does KAZ have of Seipel's or Action Authority's use of the eWarehouseA-Z backup tapes or source code in connection with any activities or interaction it engaged in with JWR within three years of filing this lawsuit.

As indicated previously, Nigam Arora's hearsay testimony regarding what former employees of JWR told him is not admissible as support for KAZ's claim.   Nigam Arora's affidavit testimony does include assertions that Seipel admitted to Arora in 2005 that, through Action Authority, Seipel had offered to utilize the source code and provide support to a KAZ client, NalPac, and that Seipel also told him that he had used KAZ software to work on and sell competing software.  There is no evidence which would

14

corroborate these affidavit assertions and, in fact, in earlier deposition testimony Nigam Arora states that he was told of the NalPac circumstances by his previous counsel.  He cannot change his sworn deposition testimony through a later submitted affidavit.  More importantly, the complaint in this lawsuit contains no allegations with regard to competing software or NalPac.  This is a lawsuit about JWR's continued use of the eWarehouseA-Z software and whether JWR and its codefendants conspired or colluded in some inappropriate manner to infringe and use copyrighted materials.  Consequently, KAZ's lack of admissible evidence regarding Seipel's or Action Authority's involvement with JWR and any infringing activities, dooms its claims of infringement and inducement to infringe as asserted against Seipel or Action Authority.

That leaves KAZ's state law claims of conversion, breach of fiduciary duty, civil conspiracy and its treble damages claim as an alleged crime victim, each of which are subject to a two year statute of limitations.  For the same reasons discussed with regard to the three year limitations period for copyright violations, KAZ's conversion claim against Seipel and his company as a result of Seipel's alleged retention of the software backup tapes is barred by the two year Indiana statute of limitations for bringing an action for conversion.  *See* Ind. Code § 34-11-2-4; *French v. Hickman Moving and Storage*, 400 N.E.2d 1384 (Ind. App. 1980).  In addition, since KAZ was aware of any alleged criminal activity, such as conversion, theft or computer tampering, shortly after Seipel's departure, the two year statute of limitations for bringing an action pursuant to the crime victim

statute has also expired.  *See Clark v. University of Evansville,* 784 N.E.2d 942, 945-46 (Ind. App. 2003).

The two year limitations period set out in Indiana Code § 34-11-2-4 applies as well to a claim for breach of fiduciary duty.  *Bacompt Systems, Inc. v. Ashworth*, 752 N.E.2d 140, 145 (Ind. App. 2001).  KAZ attempts to hold Seipel to a post-employment, fiduciary duty in order to avoid the application of this limitations period.  It argues that Seipel's employment contract provides for the extension of certain duties even after his departure. However, KAZ makes this argument without support in the record.  Without explanation as to why, it cites to Maddox's employment contract as though the court should assume it would apply to Seipel as well.  Without evidence confirming that Seipel is subject to an identical employment contract, the court cannot make such an assumption.  Consequently, KAZ's claim of breach of fiduciary duty is also barred by the statute of limitations.

Finally[1], just as there was no admissible evidence to support a claim of infringement or inducement to infringe against Seipel and Action Authority, that paucity of admissible evidence dooms KAZ's claim of civil conspiracy as well.  Other than the inadmissible hearsay Nigam Arora claims to have heard from JWR and KAZ employees or former employees, KAZ has offered nothing that would help connect the dots to a

---

[1]While the court has disposed of most of the claims against Seipel and Action Authority on the basis of the running of the statute of limitations, it should be noted that many of the successful arguments raised by the other defendants, which are discussed *infra*, would apply equally to Seipel and Action Authority, providing additional bases for rendering summary judgment in their favor.

claim of civil conspiracy.  In fact, the dots themselves seem to be missing.  Accordingly, summary judgment is appropriately entered in favor of Seipel and Action Authority.

Defendant Guy Hensley

Early on in this lawsuit, Defendants Guy Hensley and JWR moved this court to dismiss them from the lawsuit based upon a lack of personal jurisdiction.  Hensley claimed, and continues to claim, that his only involvement throughout the relevant time period has been as in-house counsel for JWR and that he has had insufficient contacts with the state of Indiana to support personal jurisdiction.  On September 1, 2006, the court denied the motion to dismiss, finding that while neither JWR nor Hensley had sufficient contacts with Indiana to support general personal jurisdiction, there was sufficient evidence to support a claim based on specific personal jurisdiction as to both.  However, the court admitted that its decision to keep Hensley in the case was more difficult than its decision with regard to JWR.  The court stated that at such an early stage of the litigation, Nigam Arora's affidavit testimony stating that Defendant Maddox had admitted that he and Defendant Hensley had agreed to share an interest in Defendant Nickellie in order that they both might profit from Nickellie's use of KAZ copyrighted material in performing maintenance and design functions on the eWarehouseA-Z installation at JWR, was enough to make a prima facie showing that Hensley may have been involved personally and, therefore, subjected himself to specific personal jurisdiction.  However, the court warned: "Should the evidence show at some later time

17

that Hensley was not sufficiently personally involved in these actions, the court's

jurisdiction determination could change."

Now, in addition to claiming entitlement to summary judgement, Hensley has

renewed his motion to dismiss.  Two years have passed since the order denying Hensley's

first motion to dismiss and no additional evidence supporting Hensley's personal

involvement or his conspiring with Maddox to profit from Nickellie's work with JWR has

been brought forth.  As with nearly every issue in this case, KAZ's position is

precariously balanced on the testimony of Nigam Arora and, in this instance, not upon

testimony from Mr. Arora's own personal knowledge, but rather upon his assertion that

others in the lawsuit have made admissions to him.  Despite considerable discovery in

this matter, KAZ has garnered no additional support for its claim against Hensley.  In

fact, in the adversary proceeding brought by KAZ against Maddox in bankruptcy court,

wherein KAZ attempted to stop Maddox from discharging certain debts, Maddox

successfully defended against KAZ's allegations that he conspired to utilize KAZ's

copyrighted materials to provide maintenance to JWR and other KAZ clients.  The

bankruptcy court found that Maddox did not engage in fraud, embezzlement, theft or

racketeering.  Maddox's successful defense drains all credibility from Arora's affidavit

testimony in this case regarding Maddox's alleged admissions.  Moreover, all the

Defendants, including Hensley, have asserted that the bankruptcy court's judgment,

including its findings of fact and conclusions of law, should constitute collateral estoppel

18

with respect to numerous claims being pursued by KAZ in this litigation.

Collateral estoppel applies when the specific issue sought to be precluded has been previously litigated and was essential to the final judgment in the previous litigation. *Universal Guar. Life Ins. Co. v. Coughlin,* 481 F.3d 458, 462 (7th Cir. 2007).  In addition, the party against whom estoppel is being invoked must have been fully represented in the previous action.  *Id.*  One of the bankruptcy court's conclusions of law was that KAZ had not presented any evidence, other than self-serving testimony, to show that it was damaged.  Hensley and all his codefendants have latched on to that finding and asserted that it should have preclusive effect on the issue of damages in this case.  However, its preclusive effect must be limited to the lack of damages caused by Maddox's actions, as specifically noted in the bankruptcy court's findings.  Consequently, Defendants other than Maddox (and perhaps Nickellie) cannot use the bankruptcy court's determination with regard to the lack of proof of damages as a basis for their prevailing in this action.

On the other hand, as previously noted, Arora's testimony with regard to Maddox's alleged admissions has been completely discredited in light of the bankruptcy court's findings.  The bankruptcy court could not have reached its determination that Maddox did not engage in the type of activity which Nigam Arora claims he did without rejecting Arora's assertion that Maddox admitted to such conduct.  KAZ has not produced one iota of additional, admissible evidence to support Nigam Arora's affidavit testimony, which is itself quite vague.  Nigam Arora claims in his affidavit that "Maddox admitted to

a side deal with Hensley whereby KAZ was totally bypassed for personal gain of Maddox and Hensley (interests distinct from those of KAZ or JWR) and whereby Hensley and Beasley would secretly have beneficial interest in Nickellie, LLC, a company Maddox secretly formed while working for KAZ." Other than this vague and discredited testimony, all KAZ has to offer to support the exercise of personal jurisdiction over Hensley is Arora's own subjective speculation of Hensley's motivation.

Discovery has concluded and KAZ's case for personal jurisdiction over Hensley, which was weak to begin with, has become as nonexistent as the evidence necessary to support its claims against him. There is no support in the record for finding that Hensley engaged in any activity which would have given him fair warning that he would be personally subject to suit in Indiana. The evidence fully supports his assertion that he has simply acted as in-house counsel for JWR. Consequently, no specific personal jurisdiction attaches and Hensley's Renewed Motion to Dismiss is granted, thereby mooting his alternative request for summary judgment.

<u>Defendant JWR</u>

KAZ claims that JWR infringed its copyright, induced others to infringe, breached its contract with KAZ, tortiously interfered with KAZ's relationships with Seipel and Maddox, converted KAZ's property, committed fraud and conspired to act unlawfully or to accomplish an unlawful purpose. JWR raises numerous defenses, the first of which is

its contention that KAZ has no actionable copyright protection with regard to the

eWarehouseA-Z software.  If that defense is meritorious, the bulk of KAZ's complaints

against JWR disappear.

KAZ asserts that its ownership of the copyright registration for AMMP provides it

with copyright protection for eWarehouseA-Z, as a derivative work.  A prerequisite to

bringing suit to enforce a copyright is that the copyrighted work is registered with the

U.S. Copyright Office.  17 U.S.C. § 411(a).  JWR maintains that KAZ is not entitled to

assert copyright protection for two reasons.  First, it argues that even if eWarehouseA-Z is

a derivative product, it had to be registered to obtain copyright protection.  Second, JWR

maintains that the court should apply judicial estoppel to prevent KAZ from relying on

testimony of the Aroras regarding the relationship of eWarehouseA-Z to AMMP which is

directly contrary to the testimony they gave when they were sued in other litigation

related to the use of the software.

Exclusive authority to prepare derivative works is granted to the owner of a valid

copyright under Title 17 of the United States Code.  17 U.S.C. § 106(2).  It is undisputed

that KAZ owned the copyright for AMMP.  Therefore, it had the exclusive right to create

a derivative product.  Whether KAZ had to register eWarehouseA-Z separately as a

derivative product to be able to bring suit for copyright infringement is disputed by the

parties, and neither the Supreme Court nor the Seventh Circuit have rendered an opinion

directly on point.  However, this court is convinced that the Seventh Circuit would agree

21

with the Second, Sixth and Eleventh Circuits, which have all concluded that a derivative

work must be registered to allow the producer of that work to pursue an action based on

infringement of that specific derivative work.  *Well-Made Toys Mfg. Corp. v. Goffa*

*Intern. Corp.*, 354 F.3d 112, 115 (2d. Cir. 2003); *Murray Hill Publications, Inc. v. ABC*

*Communications, Inc.*, 264 F.3d 622, 632 (6th Cir. 2001); *Montgomery v. Noga*, 168 F.3d

1282, 1292 (11th Cir. 1999).

Recently, the United States District Court for Arizona was faced with a case with

many similarities to this matter.  In *Dalton-Ross Homes, Inc. v. Williams*, 2007 WL

2461892 (D. Ariz. Aug. 29, 2007), the plaintiff sued claiming defendant had infringed a

copyright which plaintiff held on architectural floor plans.  Plaintiff had registered a

copyright for a floor plan known as the "VDM plan" and claimed that a newer floor plan,

known as the "Conley plan" was a derivative which was entitled to protection as well.

The defendant had admittedly copied the Conley plan in designing a home.   The court

concluded as follows:

> The registration requirement in § 411(a) makes no distinction between
> derivative and original works. Whether a separate registration of a
> derivative work is a prerequisite to an action for infringement of that
> derivative work is a question of first impression in this circuit. However, we
> are persuaded that separate registration of the derivative work is required.
> See *Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 354 F.3d 112, 115 (2d
> Cir.2003) ("registration of a claim on an original work does not create
> subject matter jurisdiction with respect to a suit for infringement of the
> original's unregistered derivative"); *Murray Hill*, 264 F.3d at 632 (6th Cir.)
> ("before an infringement suit can be sustained based on the derivative work,
> that derivative work must be registered"); *Montgomery v. Noga*, 168 F.3d
> 1282, 1292 (11th Cir. 1999); *Creations Unlimited, Inc. v. McCain*, 112 F.3d

> 814, 816 (5th Cir.1997); *cf. Litchfield*, 736 F.2d at 1357 ("[t]o constitute a violation of section 106(2) the infringing work must incorporate in some form a portion of the copyrighted work"). These multi-circuit authorities, coupled with a plain reading of section 501(b) in conjunction with section 411(a), indicate that in order to file an action for infringement of a derivative work, the plaintiff must first register the copyright of that derivative work.

*Dalton-Ross Homes*, at*3.  The Seventh Circuit would likely join the jurisdictions which have adopted this or a similar analysis.[2]

This court is similarly persuaded that the owner of a derivative work must register its copyright, just as it would for a work that was entirely original, if it seeks to pursue an action based on the infringement of that new work.  The term "derivative work" is defined by statute as a work which is based upon one or more preexisting works and consists of editorial revisions, annotations, elaborations, or other modifications which , as a whole, represent an original work.  17 U.S.C. § 101.  In order for a work to be considered derivative, it must have been substantially copied from the prior work.  *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984).  However, the analysis does not stop here with regard to KAZ's infringement claim.

---

[2]Without addressing the necessity of the same, the Seventh Circuit has, in a few cases, discussed the procurement of a registered copyright for derivative works.  Though limited discussions, in all instances, the Court appears to have assumed that the registration of derivative works was of particular value due to it being a requirement to pursue an infringement action.  *See Pickett v. Prince,* 207 F.3d 402 (7th Cir. 2000); *Lee v. A.R.T. Co.*, 125 F.3d 580 (7th Cir. 1997); *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191 (7th Cir. 1987).  In fact, in *Pickett*, the court found that the plaintiff had no right to obtain his copyright in a derivative work and therefore no right to enforce it, because his work was based on a copyrighted original which he had substantially copied without permission.  *Pickett,* 207 F.3d at 406.

Though KAZ's complaint alleges that the Defendants have infringed upon the copyright for eWarehouseA-Z, it attached the copyright registration for AMMP to its complaint and specifically alleged in the complaint that eWarehouseA-Z is "from" AMMP (whatever "from" is intended to mean).  In addition to its unsuccessful argument that a derivative product like eWarehouseA-Z need not be registered for an action alleging infringement of that derivative, KAZ also contends in its briefing that the "pre-existing version" of eWarehouseA-Z, or AMMP, has had its copyright violated as well. The notion that the copyright for an original work can be infringed by the copying of an unregistered derivative is consistent with the cases finding that a derivative work  must be registered before the derivative work, itself, can be the subject of an infringement action. In fact, in the *Montgomery* case, the Court specifically ruled that infringement of an original registered software program or earlier registered version occurs when a subsequent derivative is copied, if the evidence shows that a majority of the source code from the registered version is incorporated into the unregistered derivative and operation of the unregistered derivative is dependent upon that source code from the registered version of the software.  *Montgomery,* 168 F.3d at 1292.

This is not a case where it would be a surprise for Defendants to learn that it is actually the copyright of AMMP and not eWarehouseA-Z which they are said to have infringed.  It has been clear from the beginning that the copyright registration relied upon in this case is for AMMP, regardless of the spin that KAZ attempts to employ by referring

to the copyright as being for eWarehouseA-Z.  It is not a "stretch" for the court to interpret the complaint liberally enough to include a claim for a violation of the AMMP copyright, when the copyright registration itself is attached to the complaint.  And, since Defendants have been well aware of the actual registered copyright at issue, it would be wrong for this court to grant summary judgment to the Defendants based solely upon the fact that KAZ failed to register its copyright for eWarehouseA-Z, which it claims to be nearly identical to AMMP.

However, Defendants are not without an additional argument for throwing out KAZ's infringement and inducement claims.  That argument is directly related to the fact that KAZ claims that eWarehouseA-Z is nearly identical to AMMP.  According to Defendants, the principals of KAZ, Nigam and Lovi Arora have taken the opposite position in other litigation.  Defendants argue that judicial estoppel should be employed to bar KAZ from relying on Nigam Arora's contradictory testimony in this case as a basis for establishing that AMMP's copyright has been infringed through the unlicensed use of its derivative, eWarehouseA-Z.

Judicial estoppel is a doctrine available to protect the integrity of the judicial process.  Its aim is to prevent a party from prevailing in one lawsuit on grounds which it repudiates in another.  *Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905, 914 (7th Cir. 2005).  The doctrine is flexible, with no precise or rigid formula, and is best applied to prevent manipulation by "chameleonic litigants who seek to prevail, twice, on opposite

theories." *Levinson v. U. S.*, 969 F.2d 260, 264 (7th Cir. 1992).  It is a prerequisite that

the party must have prevailed on the basis of its earlier position.  *Jarrard*, 408 F.3d at

914.

JWR refers this court to testimony provided by Nigam Arora in a lawsuit brought

against him and his wife by ten individuals.  In his deposition, Nigam Arora describes the

history of ASA and his purchase of the same through an acquisition company (referred to

in the deposition as ASA 2) when ASA met with little to no success.  He testified

regarding the later merger of that acquisition company with KAZ.  In pertinent part, the

exchange from that deposition went as follows:

> Q.  And did KnowledgeAZ have assets that in some fashion would be strategic or help ASA 2's products?
> A.  No, not really.  This was - - this really was - - you know, very frankly, as I'm reading this thing, you know, somebody said this was in the best interest of KnowledgeAZ.  It wasn't.  It was in the best interest of ASA 2, but it really was not in the best interest of KnowledgeAZ.
> Q.  And, sir, is it true that the effect of that merger was that all of the minority shareholders that were in ASA 2 were bought out of the business?
> A.  That's true.
> Q.  And did KnowledgeAZ ever utilize any of the assets that it acquired via the merger?
> A.  Well, utilized in the sense that that was the purpose of the winding down that business in a responsible manner.  Of course you do that.  So it used - - so it was KnowledgeAZ's at that point, obligation to wind it down in a responsible manner, and that's what we did.
> Q.  And it did that?
> A.  Yeah.
> ...  ...
> Q.  Did KnowledgeAZ ever make any money as a result of the technology or assets that came over from ASA 2?

26

A.    I would say that would be a loss to KnowledgeAZ.

Q.    And what ultimately happened to the technology that had been developed within ASA 2 that was transferred over to KnowledgeAZ? And by that I mean, was it just thrown away? Did it become worthless?

A.    It was - - I mean, the technology itself was near worthless. But ultimately, you know - - I was ready to abandon it. If you're getting into some area that KnowledgeAZ made lots and lots of money, that's not it.

...    ...

Q.    And I guess let me try that question a different way. Technology did come over from ASA 2 to KnowledgeAZ; correct?

A.    It has to. That's the definition of merger. You get all the assets, liabilities, everything. ....

...    ...

Q.    That technology that came over from ASA 2, did KnowledgeAZ utilize that technology for some other project as opposed to just winding down the business of ASA 2?

A.    No. It was only winding down the business. ...

JWR states in its brief that Mr. Arora's testimony comes from a lawsuit brought by disgruntled former shareholders of ASA who were accusing the Aroras of an improper freeze-out. However, it provides no evidence to support this assertion. Further, while there may be some reason to believe that Mr. Arora's testimony in this other lawsuit stands as a contradiction to his testimony in this lawsuit, it is not completely clear that he is discussing the AMMP software in that portion of the deposition submitted by JWR. Finally, the court has no way of knowing whether the Aroras successfully defended this other lawsuit.

The testimony of Lovi Arora in another action brought against her, her husband and two business entities by a former ASA employee is more clearly contrary to the

position taken by KAZ in this lawsuit.  JWR provides a deposition transcript from that

litigation which includes Lovi Arora stating that the software product sold by ASA and

later ASA 2 had not kept up with the new technology and that only 10% of the original

software remained viable.  She also testified that the new software being sold by

KnowledgeAZ was "not in any way, shape or form" the same as the previous software.

However, again the court is not provided with evidence of who prevailed in the lawsuit or

what the nature of the claim was.  Further, KAZ claims that the Aroras' statements are

being taken out of context.

While it appears from their testimony that Nigam and Lovi Arora were advancing

positions in these other lawsuits which are inconsistent with the position KAZ is taking in

this case, without additional evidence which would clarify what the lawsuits were about

and who won those lawsuits, there is insufficient evidence of record for the court to

employ judicial estoppel to throw out KAZ's copyright claims in this case.  On the other

hand, the court rejects KAZ's claim that the Aroras' testimony from the other lawsuits is

inadmissable because KAZ was not a party to the other cases and the testimony is

hearsay.  The introduction of sworn testimony from another proceeding containing an

admission against interest by a party opponent is clearly relevant and admissible under

Rule 801(d)(2) of the Federal Rules of Evidence.  As principals of KAZ and its

predecessor (which actually was a party in one of the lawsuits), statements made by the

Aroras which draw upon their knowledge as corporate officers or representatives and are

28

against the interest of KAZ in this lawsuit, are not hearsay and may be introduced as evidence and used against KAZ. Fed. R. Evid. 801(d)(2)(A). While Nigam and Lovi Arora may be able to distinguish their prior remarks or shine a less prejudicial light on them by giving the remarks some additional context, there is no doubt that their prior testimony under oath has, at a minimum, created a question of fact as to whether eWarehouseA-Z contains sufficient content from AMMP that infringement of the alleged derivative would constitute infringement of AMMP.

Juries have proven time and time again that they are quite capable of sorting the wheat from the chaff when it comes to witness credibility and prior inconsistent statements. They will likely have that chance in this case as well.

JWR asserts additional arguments to support summary judgment in its favor. Like Seipel and Action Authority, it too relies on Indiana's two year statute of limitations as well as the two year limitations period set forth in the SS Agreement to bar any claim resulting from its continued use or maintenance of the eWarehouseA-Z software and system. The SS Agreement provides that: "No lawsuit, regardless of form, arising out of this Agreement can be brought more than two years after the cause of action occurs." If the contractual limitations period is not applicable, Indiana's two year statute of limitations, Indiana Code § 34-11-2-4, would apply to bar any claim for conversion, tortious interference or civil conspiracy that accrued more than two years prior to the

filing of this lawsuit.[3]

Nigam Arora's January 6, 2003, letter to Jim Almond at JWR is a key piece of evidence with respect to the application of the statute of limitations.  In that letter, Mr. Arora maintains that Maddox stole KAZ's software and asserts that JWR is "colluding" with Maddox and possibly other former KAZ employees.  He specifically demands that JWR "cease and desist" its collusion.  This, along with Nigam Arora's corroborating deposition testimony, is undeniable evidence that more than two years prior to filing this lawsuit, KAZ believed that JWR was engaged in a civil conspiracy to obtain the use of KAZ software and infringe upon its copyrighted works.  Despite KAZ's attorneys' prior confirmation of KAZ's inability to continue to honor its contract requirements, in his letter, Nigam Arora claimed that JWR breached the contract and that KAZ was revoking any license JWR had to use eWarehouseA-Z.  Consequently, the two year statute of limitations agreed to by the parties began to run at that point on any claim for breach of contract, copyright infringement, inducement to infringe or conversion.[4]

KAZ claims that JWR's copyright infringement was ongoing and that the statute of

---

[3]In a footnote to its brief, JWR makes an argument that the court's order deeming KAZ's Amended Complaint as filed on August 25, 2005, moves the statute of limitations period because the Amended Complaint would not relate back to July 12, 2005, the date the original complaint was filed.  The argument is a nonstarter, as the language used by the court was not intended to create or affect any  "relation-back" issue.

[4]There is no question that KAZ's copyright claims arise out of the contractual relationship between it and JWR and consequently, would be subject to the shorter two year limitations period in the SS Agreement.

limitations does not begin to run until a continuing wrong is completed.  That argument fails for two reasons.  "A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period".  *Dasgupta v. University of Wisconsin Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997).  JWR's ongoing use of the eWarehouseA-Z software after KAZ purportedly revoked its license, if wrongful, would have constituted a wrong which could have been made the subject of a lawsuit immediately.  Further, the SS Agreement, which was drafted by KAZ, states that no lawsuit may be brought unless it is brought within two years "after the cause of action occurs."  Typically, limitations periods are measured from when a cause of action accrues, which may be when a damaging act occurs, when a party learns of a particular damaging act or when the party learns of the consequences of the act.  Here, when KAZ drafted the SS Agreement, it elected to use the term "occurs" as opposed to "accrues."  The court can only assume that the intent was that the limitations period begins when the damaging act occurs, regardless of when KAZ learned of the act or its consequences.

Alternatively, KAZ argues that JWR engaged in infringing acts after July 12, 2003.  It makes a broad assertion that anytime JWR causes the software to operate, that execution amounts to another infringing act.  This court does not accept the proposition that the daily use of the eWarehouseA-Z software by JWR, after KAZ stopped

functioning as a business entity and purportedly withdrew JWR's license, amounts either to an incomplete ongoing violation or a unique, new daily violation that could be actionable indefinitely.  KAZ cites to no precedent in making its assertion that each execution of the software is a distinct violation and the court finds no support for that assertion.  The bottom line here is that KAZ knew JWR had to constantly use the software to do its business.  If that use violated KAZ's copyright protections or the contract between the two companies, KAZ needed to bring suit within the two year limitations period it placed in the SS Agreement.

In addition to the broad assertion the court just rejected, KAZ contends that JWR and Nickellie infringed its copyright when Nickellie provided what it called the "Inter-Org Transfer module" in late July of 2003 and then also provided additional interactive software in October of 2003.  JWR's receipt and use of these software modules is not denied, though it is claimed that the software did not infringe any copyright and that the bankruptcy court has already made that determination in connection with the adversarial proceeding brought by KAZ against Maddox.  The bankruptcy court did find that: "Nickellie developed new custom software applications for use by JWR and did not provide any service for or support of KAZ software for JWR."  However, KAZ relies on the technical testimony of Nigam Arora to the effect that the only way for the Nickellie software to interact with eWarehouseA-Z is if the copyright protected code from AMMP is accessed or used.

32

Unfortunately, the record is not detailed enough for the court to feel secure in determining whether the bankruptcy court has already determined the specific issue of whether the Nickellie software modules identified by KAZ infringed the AMMP copyright. Therefore, no estoppel can be applied. Accordingly, KAZ's contention that copyright violations occurred within two years of the filing of the lawsuit remain unresolved and subject to disputed facts. To the extent that KAZ raises a claim for copyright infringement, or inducement to infringe, in connection with Nickellie and JWR utilizing the source code from the copyrighted AMMP program in creating the two additional software programs added to the software system, such a claim would remain timely and survives summary judgment.

KAZ's claim that JWR tortiously interfered with the employment relationship between KAZ and Maddox or Seipel does not arise out of the contract between JWR and KAZ and, therefore, the two year limitations period from the point of the occurrence does not apply. Instead there would be a two year limitations period from the point that such interference was discovered. Mr. Arora's January 6, 2003, letter to Mr. Almond at JWR indicates that at that time KAZ believed JWR and Maddox were colluding and that JWR might also have been colluding with other former KAZ employees as well. However, that letter does not clarify whether that "collusion" began during the time that Maddox, Seipel or others were still employed or under contract with KAZ, a prerequisite to a tortious interference claim. Accordingly, if KAZ had any evidence to support a claim that JWR

began conspiring with Maddox or Seipel before their departures from KAZ and KAZ was not aware of that evidence until a point within two years of filing suit, a timely tortious interference claim could be raised.  However, again, KAZ is unable to identify any admissible evidence of such collusion.

KAZ's only evidence that JWR engaged in activity which might constitute tortious interference comes from one or more of the many affidavits submitted by Nigam Arora in this case.  Also, other than his discredited testimony regarding alleged admissions of Maddox, the relevant Nigam Arora affidavit testimony is based upon hearsay, as opposed to personal knowledge.  He claims that Irv Huffman, a former KAZ employee, told him that Seipel had worked out a deal with JWR before he left KAZ that allowed JWR to bypass KAZ and utilize eWarehouseA-Z's source code.  This is pure hearsay and clearly inadmissible.  The only other supporting testimony offered by Nigam Arora and KAZ amounts to pure self-serving speculation, as epitomized by Mr. Arora's affidavit testimony that "KAZ, Hensley, Beasley, and JWR entered into an undisclosed side deal with Maddox and Nickellie, LLC to obtain additional software support and customization work, and bypassing KAZ ... ."  Accordingly, the tortious interference claim fails for lack of evidentiary support.

Unlike the tortious interference claim, which required evidence of collusion or interference prior to the departures of Maddox or Seipel, KAZ's civil conspiracy claim against JWR could be supported by evidence that collusion occurred subsequent to Seipel

or Maddox's departure from KAZ.  However, as is the case with nearly all of the

testimony from Nigam Arora, his assertions of collusion subsequent to the departure of

the two employees is based upon either mere speculation or hearsay.  For example,

Nigam Arora says he first learned of Seipel providing support to JWR for eWarehouseA-

Z in August 2003 during a phone conversation with Jim Beasely of JWR.  Beasley is now

deceased and no longer a party to the litigation.  To establish that Beasely's remarks,

which are vague to begin with, are not hearsay, but admissible admissions under Fed. R.

Evid. 801(d)(2)(C), KAZ would need to show that Beasely was an agent of JWR

authorized by JWR to make statements regarding software support.  KAZ has not made

such a showing, nor has it offered any evidence other than the self-serving affidavits of

Nigam Arora which might support the notion that a conspiracy existed to accomplish an

unlawful purpose or a legitimate purpose through unlawful means.  Consequently, KAZ's

civil conspiracy claim must fail as well for lack of evidence.

Finally, there is KAZ's claim that it was defrauded by JWR.  KAZ contends that

JWR, through its agents and employees, made intentional misrepresentations regarding its

possession and use of eWarehouseA-Z, software documentation, the source code and its

interactions with KAZ employees and former employees, and that KAZ relied on those

misrepresentations in deciding not to pursue certain remedies it might otherwise have

been entitled to.  JWR's only challenge to this final count of KAZ's Amended Complaint

is that it is time barred, because any statements made by JWR representatives upon which

KAZ relied must have been made more than two years prior to the filing of the lawsuit. KAZ provides a solitary response, pointing to Mr. Arora's affidavit testimony stating that he had a phone conversation with Guy Hensley of JWR in August of 2003 (less than two years prior to filing suit), wherein Hensley informed Nigam Arora that JWR was not using eWarehouseA-Z, did not have the source code and had not been in contact with the former KAZ employees.  In its reply, JWR simply contends that KAZ cannot support its claims solely with "self-serving" affidavits.

There is a difference between self-serving allegations or speculation and self-serving testimony as to facts.  While it is true that an affidavit which provides mere self-serving speculation will not defeat a summary judgment motion, *see Karazanos v. Navistar Intern. Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991), where an individual offers affidavit testimony setting forth specific facts, of which he is in a position to have personal knowledge, that statement may well be self-serving and raise credibility issues, but credibility issues do not effect the statement's admissibility or completely eliminate its impact.  After all, "any testimony by a party to a suit is self-serving."  *Sorrentino v. I.R.S.*, 383 F.3d 1187, 1197 (10th Cir. 2004).  And, though KAZ seems to counter the arguments and evidence of Defendants exclusively with its sole shareholder's own personal, factual account, it is not as though in this instance JWR has provided any evidence to counter or negate Mr. Arora's claim of fact.  Unlike the issue of Mr. Arora's testimony that Maddox made certain admissions as to conduct, which testimony was

36

negated by the factual and legal findings of the bankruptcy court, nothing in the record currently before the court repudiates Mr. Arora's testimony that Hensley made certain statements to him in a telephone conversation which occurred in August 2003.  Therefore, JWR's argument that the fraud claim is time barred cannot prevail and KAZ may move forward with that claim.

## CONCLUSION

Much of KAZ's case must be disposed of here because it failed to bring timely claims and failed to develop admissible evidence to support most of its claims which were brought within the applicable limitations period.  What survives is very limited and a trial of the remaining claims should be relatively streamlined.

KAZ still has a viable claim against JWR for copyright infringement or inducement to infringe for any infringing activity which took place within two years prior to its filing suit.  More specifically, KAZ must show that its unregistered work, eWarehouseA-Z, is sufficiently derivative of the registered work, AMMP, so that the operation or use of the eWarehouseA-Z software is dependent upon it having copied significant portions of AMMP's source code and, hence, an infringement of eWarehouseA-Z would also infringe upon the protected software, AMMP.  After KAZ establishes that a particular type of use of eWarehouseA-Z infringes on the AMMP copyright, it must then show that JWR engaged in this unlicensed use or induced others to

do so within two years prior to KAZ filing suit.

KAZ may also move forward with its claim of fraud.  To prevail it must convince a jury through admissible evidence that JWR's authorized representatives knowingly made false statements regarding the circumstances surrounding its use or maintenance of the eWarehouseA-Z software, causing KAZ to rely upon those statements to its detriment.

The fact that the court is allowing KAZ to move forward with these claims, does not leave JWR without an ability to assert its defenses, such as the provisions of the SS Agreement.  For example, it seems likely that the success of the remaining claims could turn on whether or not a jury finds that KAZ was insolvent or incapable of providing services described in paragraph 6 of the SS Agreement.  Insolvency or inability to meet certain contractual requirements, triggers an entitlement on the part of JWR to the source code; or, stated another way, JWR's continued use and maintenance of the software remains contractually licensed and KAZ would have incurred no damages.  While it is clear that KAZ was in trouble as of December 2002, there is insufficient evidence at this point for the court to rule as a matter of law that KAZ was insolvent or incapable of providing contractually required services.

Accordingly, for the reasons set forth in this entry, Defendant Guy Hensley's Renewed Motion to Dismiss (Docket # 356) is **GRANTED**.  Defendants Dennis Seipel's and Action Authority's Motion for Summary Judgment (Docket # 364) is **GRANTED.**

Plaintiff's Motion for  Partial Summary Judgment (Docket # 358) is **DENIED.**

Defendants Guy Hensley's and Jim Walter Resources, Inc.'s Motion for Summary

Judgment (Docket # 359) is **GRANTED IN PART** and **DENIED IN PART**.  The

motion is denied with respect to KAZ's fraud claim against Jim Walters Resources, Inc.

It is also denied with respect to KAZ's copyright infringement and inducement to infringe

claims against Jim Walters Resources, Inc., insofar as such claims apply to any infringing

activity which may have taken place within two years prior to its filing this lawsuit.  The

motion is denied as moot with respect to Defendant Hensley, whose motion to dismiss the

court has contemporaneously granted.   The motion is granted in all other respects.

**SO ORDERED** this 30th day of September 2008.


_____

  RICHARD L. YOUNG, JUDGE
  United States District Court
  Southern District of Indiana

39

Electronic Copies to:
Kevin M. Boyle
OVERHAUSER LAW OFFICE
kboyle@overhauser.com

Jason L. Fulk
HOOVER HULL LLP
jfulk@hooverhull.com

Kandi Kilkelly Hidde
BINGHAM MCHALE LLP
khidde@binghammchale.com

John T L Koenig
BARNES & THORNBURG LLP
jkoenig@btlaw.com

Briana Lynn Kovac
BINGHAM MCHALE LLP
bkovac@binghammchale.com

Paul B. Overhauser
OVERHAUSER LAW OFFICES
poverhauser@overhauser.com

Rafael A. Sanchez
BINGHAM MCHALE LLP
rsanchez@binghammchale.com

Dennis Scott Schell
OVERHAUSER LAW OFFICE
dschell@overhauser.com

Stephen Lewis Vaughan
INDIANO VAUGHAN LLP
steve@iplawindiana.com

Copy to:

DANIEL MADDOX
13550 Uhl Lane NW
Palmyra, IN 47164

40